FELICIA AND LILOI TUITAMA
P.O. BOX 506
BOWDON, GA 30108-0506
Tel: (805) 983-1448
Fax: (805) 642-1287

Parties in pro se

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| FELICIA TUITAMA, an individual; and LILOI TUITAMA, an individual,<br><br>        Plaintiffs,<br><br>        vs.<br><br>FORTRESS INVESTMENT GROUP LLC; LXS 2005-5N; NATIONSTAR MORTGAGE LLC; SOLUTIONSTAR SERVICES LLC; BARRETT DAFFIN FRAPPIER TREDER & WEISS LLP; TITLE 365 Company, a corporation; XOME, INC., a corporation; NBS DEFAULT SERVICES LLC; and DOES 1-10,<br><br>        Defendants. | Case No.: 2:17-cv-03084-MWF-JPR<br><br>The Honorable Michael W. Fitzgerald<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. Title Slander<br>2. Violations of HBOR 2924(a)(6) (California Homeowners Bill of Rights)<br>3. Violation. HBOR 2924.12(a)(1)/2924.17 (California Homeowners Bill of Rights)<br>4. Cancellation of Instruments (California Civil Code § 3412)<br>5. Quiet Title (Against all Defendants) |

<u>**DEMAND FOR JURY TRIAL**</u>
<u>**THIS IS A VERIFIED COMPLAINT**</u>

## 1. INTRODUCTION

Married Plaintiffs Felicia and Liloi Tuitama challenge Defendants' imperious attempts, by recordation of false and legally-deficient documents in violation of California's Homeowners Bill of Rights, to foreclose on Plaintiffs' house and cloud title thereof. Plaintiffs, as will more fully appear, seek equitable and other relief on procedural and substantive grounds. Defendants aim to unlawfully auction Plaintiffs' house on July 6, 2017.

## 2. JURISDICTION

1. Plaintiffs allege that this action falls under California state jurisdiction alone, because:

    a) this action does not raise a federal question;

    b) diversity of citizenship between this action's litigants does not exist; and

    c) supplemental (discretionary) federal jurisdiction is inapplicable in this case.

**A. This action does not raise a federal question**

2. Plaintiffs began this action seeking California remedies under California statutes. This action did not arise "under the Constitution, laws, or treaties of the United States," as 28 U.S.C. § 1331 provides, when ["...The district courts shall have original jurisdiction..."] For a case to arise under federal law, a plaintiff's complaint must establish (1) that federal law creates the cause(s) or (2) that plaintiff's relief hangs on a substantial federal law question. *K2 Am. Corp. v. Rolland Oil & Gas, LLC*, 653 F.3d 1024, 1032 (9th Cir. 2011); *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392-93 (1987). Plaintiffs' original state filing and this FAC both advance claims that fall solely under California state law. This action therefore does not raise a federal question.

**B. Diversity of citizenship between this action's litigants does not exist**

3. Plaintiffs next allege that diversity-based subject matter jurisdiction is likewise absent. Only in actions where complete diversity of citizenship exists among litigants does such subject matter jurisdiction arise. 28 U.S.C. § 1332. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978 ["Therefore...diversity jurisdiction is not to be available when any plaintiff is a citizen of the same State as any defendant."] 374, 98 S.Ct. 2396; *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996).

**B.1. (Diversity, Continued) LLC citizenship hinges on LLC constituent members**

4. For purposes of determining diversity, a limited liability company is a citizen of all states in which its constituent members are citizens. *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (Carden).[1]

---

[1] SCOTUS reaffirmed more recently in *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 569, 124 S.Ct. 1920, 1923, 158 L.Ed.2d 866 (2004).

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

5. Under 28 U.S.C. §1332(c)(1), a corporation is deemed both a citizen of the state of its incorporation and state of its principal place of business. In *Carden*, SCOTUS refused to extend the statute to unincorporated associations. Reasoning that § 1332(c)(1)'s explicit terminology ("corporation") precluded its application to unincorporated associations, the Court held that a limited partnership did not possess citizenship independent of its members.

6. Consequently, federal courts must look to citizenship of a partnership's limited, as well as its general, partners to determine if there is complete diversity. That only the general partners have exclusive, complete control over operations and litigation is irrelevant. *Carden,* at 195. The Court preserved this view and deferred to lawmakers for modifications. ["Whether and which artificial entities other than corporations are entitled to be considered citizens for diversity purposes are complex questions best left to Congress to decide."] *Carden*, 494 U. S. 196-197.[2]

**B.2. (Diversity, Cont.) Four Defendants' members share Plaintiffs' GA citizenship**

7. Plaintiffs on knowledge and belief allege that diversity of citizenship between litigants in this action does not exist because four Defendants share Plaintiffs' Georgia citizenship.

8. Plaintiffs on knowledge and belief allege that Defendant Fortress Investment Group LLC has a member-subsidiary that was at all times a Georgia citizen: Fortress Investment Group of Atlanta (FIGA), that at all times operated at 3290 North-side Pkwy NW, Suite 350, Atlanta, GA 30327. Georgia identifies FIGA as a GA limited liability company (Entity 15033828). FIGA is a Fortress Investment Group LLC partner, member, and subsidiary.[3] Defendant Fortress Investment Group LLC therefore accrues Georgia citizenship via FIGA and as such, there exists shared citizenship between the Defendant Fortress Investment Group LLC and Plaintiffs. Defendant Fortress Investment Group LLC's citizenship, furthermore, hinges on citizenship of its shareholders (see B.3 below).

---

2  *Carden* is a widely criticized opinion. See Christine M. Kailus, *Diversity Jurisdiction and Unincorporated Businesses: Collapsing the Doctrinal Wall,* 2007 U. ILL. L. REV. 1543, 1548-49 (2007); Debra R. Cohen, *Limited Liability Company Citizenship: Reconsidering an Illogical and Inconsistent Choice,* 90 MARQ. L. REV. 269, 271 (2006); G. D. Porter, *Incorporating Limited Partnerships into Federal Diversity Jurisdiction: Correcting Carden v. Arkoma Associates,* 65 Notre Dame L. Rev. 287 (1990).

3  Fortress Investment Group LLC 2015 10-K ["Fortress Operating Group or FOG refers to limited partnerships and their subsidiaries through which we conduct our business and hold our investments. The public company controls the Fortress Operating Group through wholly owned subsidiaries that serve as the general partner of each FOG entity."] Definitions and Terms.

9. Plaintiffs on knowledge and belief allege that Defendant Nationstar Mortgage LLC also has a member and subsidiary that boasts Georgia citizenship: Harwood Service Company of Georgia, LLC ("Harwood"). Georgia classes Harwood as a domestic limited liability company (Entity 0224743). Harwood's most recent filing indicates that Harwood was merged out to join Nationstar (in Texas). However, for purposes of testing diversity of citizenship, merged-out or defunct companies remain citizens of the state in which they were established or incorporated. *Parker v. Moore*, No. C 08-1896 PJH, 2008 WL 2220613, at *1 (N.D. Cal. May 27, 2008). *Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 291-92 (4th Cir. 1999); *Midatlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995); and *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992). For purposes of determining diversity, Harwood therefore remains a Georgia citizen.

10. Plaintiffs on knowledge and belief allege that Defendant Defendant BARRETT DAFFIN FRAPPIER TREDER & WEISS LLP ("Barrett") is a Georgia citizen. Georgia lists Barrett as a current, in-good-standing foreign limited partnership duly licensed and registered therein under Entity Number 08016740. On this basis, and given Barrett's chosen means of organization and given how it has situated its general and limited partners, Barrett falls under *Carden*. ["For purposes of determining diversity, a limited liability company is a citizen of all states in which its constituent members are citizens."]

### B.3. The Carden Rule on unincorporated associations comprehends trusts

11. For an artificial entity other than a corporation, citizenship depends on the citizenship of all its members, including shareholders. *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1339 (11th Cir. 2002). ["citizenship of trust fund members is determinative of the existence of diversity of citizenship," and courts must hold them "...as a citizen of each state in which one of its shareholders is a citizen."); 13F Charles Alan Wright, Arthur R. Miller Edward H. Cooper, Federal Practice Procedure § 3630.1 (3d ed. 2009) ("The majority view...citizenship of each member of an unincorporated association must be considered...").

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

12. Defendant LXS 2005-5N (a REMIC) also falls squarely under *Carden*. Its citizenship for diversity testing thus depends on citizenship of its members. Defendant LXS 2005-5N issues certificates in varied denominations, including $25,000.00. Defendant LXS 2005-5N, with $2.7 billion in assets, has tens of thousands of members. Of these, many are institutional investors like Federal Home Loan Bank of Atlanta (FHLBA) that are, for diversity tests, citizens of no state.[4] Yet, there exist LXS 2005-5N more modest, private certificate-holders and members who do share Plaintiffs' Georgia citizenship, including:

[a] Peter G. Babcock of Marietta, GA;

[b] Catherine A. Castelo of Atlanta, GA; and

[c] Gary W. Moye of Marietta, GA.

13. Plaintiffs allege that 3-5 percent of LXS 2005-5N members are Georgia citizens and that said fact is dispositive. *Carden* is "technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organization." *Carden*, 494 U.S. at 196; and *Underwriters at Lloyd's, London v. Osting-Schwinn*, No. 08-15809, 2010 WL 3056606, at *9 (11th Cir. Aug. 5, 2010) (noting that the Carden rule "does not admit of exceptions based on convenience or practicality.") Whether, in truth, REMIC trusts ought one day be elevated to corporation status, *Carden* today remains "the law of the land."[5]

### B.4. Conclusion on Diversity of Citizenship

14. Defendants Fortress Investment Group LLC, Nationstar Mortgage LLC, Barrett, and LXS 2005-5N all maintain Georgia citizenship by virtue of their constituents/members. Plaintiffs thus on knowledge and belief allege that diversity does not exist here; this action ought return to California state court, an outcome consistent with authorities from all federal appellate districts.[6]

---

4    *Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.*, Nos. 10-3039, 10-3045, 2010 WL 5394742, at *6-8 (N.D. Cal. Dec. 20, 2010); *Federal Home Loan Bank of Seattle v. Deutsche Bank Securities, Inc.*, 736 F. Supp. 2d 1283, 1286 (W.D. Wash. 2010); *Federal Home Loan Bank of Seattle v. Barclays Capital, Inc.*, No. C10-0139, 2010 WL 3662345, at *1-2 (W.D. Wash. Sept. 1, 2010).

5    SCOTUS in 2016 explicitly applied *Carden* to real estate investment trusts. *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1014 (2016) ["..Then as now we reaffirm that it is up to Congress if it wishes to incorporate other entities into 28 U.S.C. § 1332(c)'s special jurisdictional rule."]

6    E.g., *Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54-55 (1st Cir. 2006); *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000); *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010); *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir. 2004); *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008); *Delay v.*

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

C. Discretionary supplemental federal jurisdiction is inapplicable here

15. Federal courts exercise federal supplemental jurisdiction only after dismissing claims over which they did have original jurisdiction. *Carlsbad Tech., Inc. v. HIF Bio, Inc.* 556 U.S. 635, 639 (2009) ("...A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it *had* original jurisdiction is discretionary.") See *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1998). Plaintiffs, however, have *never* advanced federal claims.

D. Conclusion on jurisdiction

16. Plaintiffs allege that diversity, federal question, subject matter and supplemental jurisdiction are absent. It is a court's prerogative under such conditions to confirm the facts. *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 673 (9th Cir. 2012). ("It is well established that a 'court may raise the question of subject matter jurisdiction, *sua sponte*, at any time during pendency of the action..." (quoting *Snell v. Cleveland, Inc.* 316 F.3d 822, 826 (9th Cir. 2002)).

17. Plaintiffs (as novices) are unclear how to proceed. We're certain that this case belongs in state court. The action remains superbly suited for state adjudication, given that state issues predominate and given comprehensiveness of remedies sought, remedies that California courts uniquely provide, but remedies that federal courts do not uniquely provide. If this honorable Court does not raise the matter *sua sponte*, perhaps it will grant an opportunity for litigants to brief the issue. We believe that the action belongs in the Superior Court of California at Ventura.

## 3. DEMAND FOR JURY TRIAL

18. Plaintiffs reallege Paragraphs 1-17.

19. Plaintiffs demand jury trial on all causes and issues.

## 4. PARTIES

20. Plaintiffs reallege Paragraphs 1-19

---

*Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009); *GMAC Commercial Credit, LLC v. Dillard Dep't. Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004); *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006); *Rolling Greens MHP, LP v. Comcast SCH Holdings, LLC*, 374 F.3d 1022 (11th Cir. 2004).

6

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC: PLAINTIFFS' FIRST AMENDED COMPLAINT]

## A. The Plaintiffs

21. Married Plaintiffs Felicia and Liloi Tuitama (Plaintiffs) are and were at all relevant times residents and (senior) citizens of Bowdon, Georgia who own the real property at 1831 Devonshire Dr. Oxnard, CA 93030 (the "Subject Property"). Plaintiffs have owned the Subject Property since 2002 by that certain 05/02/2002 deed of trust, a document legally known as Ventura County Recorder Instrument ("VCRI") DOC-2002-0104578-00, which recited the Subject Property's legal description as follows:

> All that certain real property situated in the County of Venture, State of California, described as follows: Lot 230 of Tract No. 3051—3, in the City of Oxnard, County of Venture, State of California, as per map recorded in Book 112, Page(s) 11 through 17 inclusive of maps, in the office of the County Recorder of said County. Except therefrom the interest conveyed to Helen M. Borchard, Frances John Henson, Margaret Mary Anderson and Ralph William Borrchard, Jr., in and to the oil, gas, other hydrocarbon substances and minerals in and under said land, but without the right to enter on the surface thereof or within five hundred (500) feet beneath the surface as conveyed in the office of the County Recorder of said County. Deed recorded December 23, 1980 in Book 5801, page 35, of Official Records and as reserved in deed recorded January 30, 1981 as document No. 9998 and 10002 of Official Records. Also except the interestconveyed to Vincent Friedrich, Ellen C. Derricks, Barbara M. Friedrich, Mary Patrician Douglas, Betty Ann Dempsey and Jeanne M. Friedrich in and to the oil, gas, other hydrocarbon substances and minerals in and under said land but without the right to enter on the surface thereof or within five hundred (500) feet beneath the surface as conveyed in deed recorded December 23, 1980 in Book 5801,

page 38 official records and as reserved in deeds recorded
January 30, 1981 as document No. 999, 10000, and 10002. Also
except the interest conveyed to Margaret D. Borchard, Francis
Robert Borchard and Joseph Eugene Borchard in and to the oil,
gas other hydrocarbon substances and minerals in and under
said land but without the right to enter on the surface
thereof or within five hundred (500) feet beneath the surface
as conveyed in deed recorded December 30, 1980 in Book 5804,
page 774, official records and as reserved in deed Recorder
January 30, 1981 as document No. 9998 and 10002. Assessor's
Parcel Number 181-0-171-055.

22. Plaintiffs refinanced by that certain 08/24/2005 Deed of Trust ("DOT"), aka VCRI 20050901-0218799, that designated the Plaintiffs as borrowers, America's Wholesale Lender ("AWL") as lender, and ReconTrust Company, N.A. ("ReconTrust") as trustee. Plaintiffs were and today remain parties to the Deed ("Deed"), mortgage ("Mortgage"), and note ("Note").

**B. The Defendants**

23. Plaintiffs on knowledge and belief allege that Defendant FORTRESS INVESTMENT GROUP LLC ("Fortress") is a Delaware-based unincorporated association (Entity 4246703) that at all times had its principal business place at 1345 Avenue of the Americas, 46th Floor, New York, NY 10105. Fortress, which bears NY DOS # 3478098, owns, controls, and finances Defendant NATIONSTAR MORTGAGE, LLC, its subsidiary.

24. Plaintiffs on knowledge and belief allege that Defendant LXS 2005-5N is a trust and an unincorporated association that at all times had its principal business place at C/O U.S. Bank Corporate Trust Services, 1 Federal Street, Boston, M.A. 02110. LXS 2005-5N is an MBS Trust that claims to own Plaintiffs' Mortgage and Note. Plaintiffs dispute this and shortly show why.

25. Plaintiffs on knowledge and belief allege Defendant NATIONSTAR MORTGAGE, LLC ("Nationstar") is and was at all times a Delaware unincorporated association that had its principal business place at 8950 Cypress Waters Blvd., Coppell, TX 75019. Nationstar claims to be servicer to Plaintiffs' Mortgage. Plaintiffs dispute this and shortly show why.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

26. Plaintiffs on knowledge and belief allege Defendant SOLUTIONSTAR SERVICES LLC ("Solutionstar") is and was at all times a Texas unincorporated association with its principal business place at 8950 Cypress Waters Blvd., Coppell, TX 75019. Solutionstar is a Nationstar subsidiary that controls its own subsidiaries, Defendants TITLE 365 Company and XOME, INC.

27. Plaintiffs on knowledge and belief allege that Defendant TITLE 365 Company (Title 365) is a former California corporation (C1942389) and now a Texas corporation (0801404688) that at all times had its principal business place at 8950 Cypress Waters Blvd., Coppell, TX 75019. Title 365, on behalf of Fortress, Nationstar, and Solutionstar records in Recorders Offices Notices of Default, Trustee Substitutions, and Trustee Sales to prepare homes (like Plaintiffs') for foreclosure and thereafter, public auction.

28. Plaintiffs on knowledge and belief allege that Defendant XOME, INC. (Xome) is a Delaware corporation that at all times had its principal business place at 750 Highway 121 Bypass Rd., Suite 100, Lewisville, TX, 75067 (32050267700). Xome operates in CA under CCN C3536428. Xome is the ground-floor Solutionstar subsidiary that conducts trustee sales of homes like Plaintiffs'. And, on July 6, 2017, Xome aims to unlawfully sell Plaintiffs' home.

29. Plaintiffs on knowledge and belief allege Defendant NBS DEFAULT SERVICES, LLC ("NBS") is and was at all relevant times a California business entity with its principal business place at 301 East Ocean Blvd., # 1720, Long Beach, CA 90802. NBS is not a subsidiary in the above chain; it instead performs legal services for remaining Defendants: NBS a) poses as DOT Trustee on Xome sales; and b) recovers for remaining Defendants houses that defaulting homeowners shield in bankruptcy. (11 U.S.C. § 362).[7]

30. Plaintiffs on information and belief allege that Defendant BARRETT DAFFIN FRAPPIER TREDER & WEISS LLP ("Barrett") is a Georgia citizen and an unincorporated association (Georgia Entity Numbers 08016740; 17004602, Managing Partner James Frappier's 01/03/2017 filing) that at all times had its principal business place at 4004 Belt Line Road, # 100, Addison, TX 75001, but Georgia prescribes service at CT Corporation System, 1201 Peach Street, NE, Atlanta, GA 30361. Barrett, for remaining Defendants, rescinds NODs.

---

7    NBS is the alter-ego of Buckley Madole PC, a Dallas-based law firm.

9

31. True names and capacities of DOES 1-10 are to Plaintiffs unknown; until Plaintiffs discover those names and capacities, Plaintiffs sue said Defendants by fictitious names. When Plaintiffs do ascertain the same, Plaintiffs will seek leave to amend this complaint.

32. On information and belief, Plaintiffs allege that a) at all relevant times, all Defendants were agents, co-adventurers, employees and/or servants of remaining Defendants; b) Defendants acted in the course/scope of such agency, employment and/or servancy; and c) each Defendant ratified acts of remaining Defendants. Plaintiffs therefore sue these Defendants, each and all of them, jointly and severally, for Plaintiffs assert that these Defendants are, each and all of them, jointly and severally liable for damages that they, as legal, proximal, and real causes of the same, inflicted on Plaintiffs.

33. On information and belief, Plaintiffs allege Fortress controls Nationstar, Nationstar controls Solutionstar, and Solutionstar controls Title 365 and Xome. These last four Defendants pose as lawful authorities, record (or cause to be recorded) Trustee Substitutions, Notices of Default, and Notices of Trustee Sales. By such operations, Defendants initiate and consummate non-judicial foreclosures in California.

34. On information and belief, Plaintiffs allege that in this case, Defendants, knowingly or otherwise, did and do undertake these acts without legal authority (and do so unlawfully), to foreclose and sell Plaintiffs' house (the Subject Property) on 07/06/2017, and thereby violate multiple California statutes, as will more fully appear.

### 5. NAMED NON-PARTIES

35. Plaintiffs reallege Paragraphs 1-34.

36. Plaintiffs name several non-parties whose inclusion was indispensable:

36.a) Countrywide Home Loans ("Countrywide");

36.b) America's Wholesale Lender ("AWL");

36.c) Bank of America, Corp. ("BAC");

36.c) Bank of America N.A. ("BANA");

36.d) Red Oak Merger Corporation ("Red Oak"); and

36.e) ReconTrust Company, N.A. ("ReconTrust")

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

37. Countrywide was, in 2005, a wholly-owned subsidiary of Countrywide Financial that operated in many states, including California, under the NY fictitious business name America's Wholesale Lender ("AWL"), Plaintiffs' mortgage lender. We loosely use the name Countrywide for brevity; Countrywide encompassed 96 entities when, in 2008, BAC agreed to rescue it from collapse. On information and belief Plaintiffs allege that Countrywide in 2005 owned AWL and by virtue of this fact, Plaintiffs' Mortgage was a "Countrywide loan."

38. On information and belief, Plaintiffs allege that at all times, BANA was a wholly-owned BAC subsidiary with its principal business place at 100 N. Tryon Street, Charlotte, North Carolina 28255. Plaintiffs name BANA to differentiate it from its parent, BAC.

39. On information and belief, Plaintiffs allege that on/about 07/01/2008, BAC subsumed Countrywide via the Delaware entity Red Oak. After 07/01/2008, Red Oak transformed into a BAC wholly-owned subsidiary, a merger vehicle by which BAC selectively routed Countrywide assets and liabilities to various BAC subsidiaries.[8]

40. BAC sought and secured approval for the Red Oak merger from the Federal Reserve Board of Governors (order 20080605a1, 06/05/2008) and Office of Comptroller of the Currency (OCC Conditional Approval # 900. May 2009).

41. Said OCC approval noted that concomitant to the merger, and "...upon BANA's acquisition of Countrywide by merger, ReconTrust Company ('Recon') will briefly become an operating subsidiary of BANA. We note BANA has represented that about a month after consummation of its acquisition of Countrywide, Recon will merge into Recon NA and cease to exist."[9]

---

[8]  By Red Oak, BAC realized Countrywide's assets and shed Countrywide's liabilities, much to the grief of many institutional investors and insurers, many of whom charged BAC with so-called "asset-stripping." *MBIA Insurance Corp. v. Countrywide Home Loans, Inc., et al.;* Index No. 602825/08 (N.Y. Sup. Ct., N.Y. County)

[9]  OCC Conditional Approval # 900. Application Control Numbers: 2009-ML-01-0003; 2009-ML-02-0003.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC: PLAINTIFFS' FIRST AMENDED COMPLAINT]

42. On information and belief, Plaintiffs allege that ReconTrust was, in 2005, a wholly-owned Countrywide subsidiary that provided "...residential mortgage loans, deposit products, investment products and other businesses and document custody services; through its subsidiary, ReconTrust Company N.A., the Bank offers mortgage foreclosure and re-conveyance services." That is, ReconTrust was Countrywide's foreclosure division.[10]

43. On information and belief, Plaintiffs allege that on and after 02/17/2009, ReconTrust became a wholly-owned BANA subsidiary, but BAC, instead of keeping representations it made to OCC about ReconTrust, retained ReconTrust. During the intervening period (or 2009-2013), BAC, via BANA, continued to operate ReconTrust. Under ReconTrust's banner, BAC recovered hundreds of millions of dollars by foreclosing on delinquent mortgages that Countrywide once owned and that remained in ReconTrust's pipeline after Countrywide's demise. BAC, through ReconTrust, undertook such foreclosures even if Countrywide's documentation was defective, and even when Countrywide no longer owned those mortgages. Twelve states consequently halted ReconTrust-initiated foreclosures during this period. In some cases, judicial rulings halted said foreclosures; in others, State Attorneys General sued or sought protective orders.[11]

## 6. STATEMENT OF FACTS

44. Plaintiffs reallege Paragraphs 1-44.

45. On 08/24/2005, Countrywide was the nation's largest mortgage lender ($490 billion). Countrywide owed its success to Countrywide Loan Underwriting Expert System (CLUES), an AI-driven system it created in 1993 to reduce underwriting costs and to curtail human bias.[12] CLUES empowered Countrywide to write more loans faster and cheaper than any other lender, and to thereby surpass its competitors, especially in the securitization market.[13]

---

10  Countrywide Annual Report, 2006. On 03/05/2007, Countrywide petitioned the Office of Thrift Supervision to convert ReconTrust to a Federal Stock Savings Association (OTS Dockets 18039; H-4361; H-4362; and H-4363). Plaintiffs doubt that this conversion took place: Countrywide failed shortly thereafter.

11  In 2012, 49 States filed 1:12-cv-00361-RMC against BAC and other servicers; defendants' misconduct, such as using false affidavits and falsifying other mortgage-related documents, underpinned unauthorized and unlawful foreclosures. The Defendants settled for $25 billion (National Mortgage Settlement; USDOJ).

12  Talebzadeh, Mandutianu, Winner. *Countrywide Loan Underwriting Expert System.* Artificial Intelligence Mag. Volume 16 Number 1 (1995); and see *Artificial intelligence at Countrywide.* Stobie. ISBN: 0-7803-3274-1.

13  It was Countrywide's AI and automation platform (based in part on CLUES) that BAC found most attractive; in this, and in Countrywide's servicing technology, BAC saw an attractive merger even after giving consideration to a long future of liabilities and litigation that lay ahead.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

46. Most securitization offerings entailed Mortgage-Backed Securities (MBS), such as collateralized mortgage obligations, pass-throughs, and mortgage-backed bonds. It was here that Countrywide most exploited its CLUES-driven edge: lenders that could write loans in volume could dramatically increase not merely their cash flow but also their credit position. The more loans written in time-period X, the higher an institution's rating; the higher an institution's rating, the greater its credit. The greater an institution's credit, the more loans it could off-load.

47. Of institutions with which Countrywide traded, Lehman Brothers was key. Lehman dealt to institutional investors (banks, pensions, unions, etc.) Countrywide sold to Lehman billions in residential mortgages, and the majority were sub-prime loans. Lehman packed these into Real Estate Mortgage Investment Conduits or REMIC (26 U.S.C. §§ 860A-860G), special-purpose-vehicles that arose in 1987 as securitization innovations.

48. One such REMIC was Lehman XS Trust Mortgage Pass-Through certificates, Series 2005-5N (Defendant LXS 2005-5N). On information and belief, Plaintiffs allege that on/about 10/31/2005, LXS 2005-5N pooled 7,474 adjustable rate, conventional mortgages of which 69% came from Indymac and 30% came from Countrywide (totaling $2.7 billion).

49. On information and belief, Plaintiffs allege that LXS 2005-5N organized as follows:

49.a) Aurora Loan Services LLC ("Aurora") was Master Servicer;

49.b) Lehman Brothers Holdings, Inc. ("Lehman") was Seller/Sponsor;

49.c) LXS 2005-5N was Issuer;

49.d) Structured Assets Securities Corporation ("SASC") was Depositor;

49.e) US Bank was Trustee;

49.f) ABN AMRO Bank N.V. (ABN) was Swap Counterparty; and

49.g) Countrywide and Indymac were Originators and Servicers.[14]

---

14 The Trust Agreement (TTA) is the Lehman XS Trust Mortgage Pass-Through Certificates Series 2005-5N Trust Agreement, SEC 000095011605003567; October 1, 2005, a public document that slightly varies from the Trust prospectus but that otherwise enumerates every Trust element.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

1    50. On information and belief, Plaintiffs allege that on 08/24/2005, AWL wrote Plaintiffs'

2    loan on the Subject Property for $600,000.00, and by 10/12/2005, contracted to sell that loan to

3    LXS 2005-5N (AWL also made such arrangements for similarly-situated loans). On information

4    and belief, Plaintiffs allege that although AWL prepared to pass Plaintiffs' loan through to LXS

5    2005-5N, AWL completed only a partial transfer (of Plaintiffs' loan) to Aurora.[15]

6    51. From 2005-2008, Plaintiffs dutifully tendered their mortgage payments and went

7    about their lives. In 2008, however, like many average Americans, the Plaintiffs encountered

8    unanticipated economic problems. These necessitated a) reorganization of finances and perhaps

9    loan modification; or b) bankruptcy. Plaintiffs did not have ready means to elect between these

10    two paths, however, because their lender (along with 62 other financial institutions) collapsed.

11    52.  By 2008, the housing market tanked. Many MBS saw heavy losses.[16] Institutions

12    faced failure because they could not obtain liquidity or raise capital (not while their portfolio

13    value was still dropping). This soured investors on MBS. These conditions persuaded banks to

14    raise rates they charged one another for money, which cooled not only interbank lending but all

15    lending. This rendered financing difficult to obtain, and by mid-2008, a global crisis was on.[17]

16    53. The aforesaid losses affected MBS because originators like Countrywide shot-gunned

17    subprime mortgages into MBS. Other lenders, to compete, relaxed their underwriting policies

18    and wrote loans they knew had unacceptably high failure risks. In one 8-month period, private

19    MBS lost 96% in value, and America nationalized critical economic infrastructure assets.[18] The

20    Crisis also heavily afflicted average Americans, who overall lost 25% of their net worth.[19]

21

22

23

---

24    15  Plaintiffs only recently learned this. As Exhibits 1 and 2 show, Aurora subsumed all rights and apparently never
25    16  These conditions especially affected mortgage assets predicated on non-prime loans in 2007. GAO, Financial
      Institutions: Causes and Consequences of Recent Bank Failures, GAO-13-71 (Washington, D.C.: Jan. 3, 2013).
26    17  GAO estimated that $10 trillion in U.S mortgages were then outstanding; 25% (or perhaps more) were troubled.
      18  These were the government-sponsored enterprises (GSEs) Federal National Mortgage Association (Fannie Mae)
27    and Federal Home Loan Mortgage Corporation (Freddie Mac). The Treasury nationalized these in 09/2008. The
      two between them held more than $5 trillion in MBS. Treasury to Rescue Fannie and Freddie: Regulators Seek
      to Keep Firms' Troubles From Setting Off Wave of Bank Failures," Washington Post. Goldfarb. 09/07/2008
28    19  The Council on Foreign Relations tabulated $8 trillion U.S. losses 2007-2008. The Great Crash, 2008: A
      Geopolitical Setback for the West. Roger C. Altman, Foreign Affairs Quarterly. Feb. 2009.

54. LXS 2005-5N-related and like institutions were not immune: of the LXS 2005-5N Agreement Parties, all but two collapsed. By 2010, the causalities fell by bankruptcy (Lehman); buy-outs (Merrill Lynch); regulatory shutdown (Indymac, Washington Mutual); or by voluntarily closing their doors (Countrywide).

55. These events triggered complex litigation between banks, counter-parties, insurance carriers, and pensions that incurred heavy MBS investment losses.[20] The Crisis, meanwhile, also devastated average citizens; a million single-family homes were foreclosed in 2010 alone. It was against this historic backdrop that this action was born. Plaintiffs were preparing for a probable bankruptcy, they relinquished another property, and they began relocation to Georgia in earnest.

56. On information and belief, Plaintiffs allege that in 07/2011, BANA surfaced, claiming to own Plaintiffs' Mortgage. Plaintiffs knew this was untrue and challenged BANA. BANA and ReconTrust responded by recording a 4-page, 07/18/2011 Notice of Default (VCRI 20110718-00104349). Plaintiffs attached 20110718-00104349 as Exhibit 4 and by such attachment, they incorporate it here. In Exhibit 4, ReconTrust falsely claimed to act for the beneficiary. Plaintiffs alleged then (and allege now) that neither BANA nor ReconTrust had beneficial interest in Deed, Mortgage or Note, nor did they represent anyone who did, not on 07/18/2011. Plaintiffs sued.[21]

57. On information and belief, Plaintiffs allege that through litigation from 2010-2012, BANA never offered documents to back its claims; instead, BANA, through counsel, provided mere xerox copies of AWL loan documents, documents that did no more than describe the loan. BANA never produced a shred of proof supporting assignments or transfers of Deed, Mortgage or Note, or other documents that could establish BANA's claimed status in related capacities.[22] This raised Plaintiffs' suspicions, especially after and how BAC subsumed Countrywide.[23]

---

20  Example: *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F.Supp.2d 258 (S.D.N.Y.2011).
21  As per Paragraph 22, ReconTrust <u>did</u> appear as trustee on the 08/24/2005 DOT, but held that distinction for days only. ReconTrust ceased as trustee on 10/12/2005, when AWL conferred that status on another entity, an entity that never thereafter ceded that status: Aurora. See Exhibits 1 and  2. Aurora never transferred its rights out.
22  Neither BANA nor ReconTrust had such rights on 07/18/2011. However, Plaintiffs did not secure proof of this fact until mid-April, 2017, when Plaintiffs ran an exhaustive title search, a search which produced markedly different results than anyone had before seen. Until Plaintiffs ran that title search, BANA and ReconTrust (and Plaintiffs, also) had relied on an inaccurate and incomplete record.
23  Such documents would presumptively be in BANA's or BAC's possession, but they were not. At the time, loan files and mortgage tapes were traversing the country en masse. Plaintiffs felt certain that if BAC or BANA had rights or interest in Plaintiffs' mortgage, they would produce evidence but no such evidence ever surfaced.

[TIHTAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

58. BANA instead recorded a self-generated 07/12/2011 Corporate Assignment of Deed of Trust of Plaintiffs' DOT to US Bank, a document that T. Sevilliano signed on ReconTrust's behalf and Ann Monteleagre (Notary #1768259) witnessed, or VCRI 20110719-0015060-0, that Plaintiffs attached hereto as Exhibit 5 which they now incorporate here by reference. Exhibit 5 exhaustively imputes notes, money and property interests to US Bank. Yet, Exhibit 5 made little sense: it purported to cede rights from an entity that never enjoyed them to another that realized those rights 6 years before (if all parties had acted in accordance with the law).

59. On information and belief, Plaintiffs allege that ReconTrust on 07/18/2011 recorded a Notice of Trustee Sale (NTS1) against the Subject Property, with ReconTrust purporting to act for the beneficiary. That NTS1 was VCRI 20111107-00154002, witnessed by Susana Gonzales, a document that Plaintiffs attached as Exhibit 6 which they incorporate here by reference. Exhibit 6 styles ReconTrust as a debt collector. ReconTrust recorded Exhibit 6 six days *after* BANA recorded Exhibit 5.[24]

60. From 2011-2013, in litigation with BANA and ReconTrust, Plaintiffs incurred great costs, but those costs were less menacing when weighed against other concerns: BANA kept Plaintiffs in fear that it (a deep-pocketed lender that falsely claimed to own their Mortgage) might seize their house. BANA evaporated in 2013, but Plaintiffs remained guarded.

61. On 04/30/2014, the instant Defendants appeared, replacing BANA and ReconTrust, but advancing identical claims. Plaintiffs see both instances (first BANA, and then Nationstar) as inextricable from one another, because today's Defendants predicate their acts on a transfer from BANA to themselves of interest in the Subject Property, a transfer that, as will more fully appear, was not lawful, and a transfer that BANA had no legal authority to issue or record.[25]

---

Plaintiffs assumed that BANA was still engaged in activity that triggered the National Mortgage Settlement.

24  That is, even if we suppose that BANA did have a legal interest in the Subject Property before 07/12/2011 (it did not), Exhibit 6 contradicted Exhibit 5 and both contradicted CA law ["There simply cannot be at any given time more than one person with power to conduct a sale under a deed of trust."]*Dimock v. Emerald Props. LLC*, 81 Cal.App.4th 868, 878, 97 Cal.Rptr.2d 260 (2000). Exhibits 5 and 6, if bona fide, would introduce conditions where not one but three distinct entities simultaneously had sale power. Such obvious inconsistencies, coupled with BANA's post-appellate disappearance, only reinforced Plaintiffs' suspicions, especially in light of the BAC Foreclosure and Claims Process Review. HUD, OIG, 03/2012 (SB 900).

25  When they assert that BANA's transfer was "not lawful," Plaintiffs employ terms in Cal. Civil Code §§ 1608 and 1667. 1667 provides that "That is not lawful which is (1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or, (3) otherwise contrary to good

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC: PLAINTIFFS' FIRST AMENDED COMPLAINT]

62. On information and belief, Plaintiffs allege that on 04/30/2014, Title 365 (for fellow Defendants) recorded a 2-page Substitution of Trustee, or VCRI 20140724-00092096-0, that Plaintiffs attached as Exhibit 8 and that they now incorporate as if it appeared here. By Exhibit 8, Title 365 purports to substitute SPLS as trustee to Plaintiffs' Mortgage. Yet, neither Title 365 nor SPLS had authority to take such action. Title 365 claimed to act for Nationstar's and Nationstar claimed to act for LXS 2005-5N, but neither produced documents to back their claims. Plaintiffs had never heard of these new entities and told them as much.

63. Title 365 next requested/recorded a 1-page 07/18/2014 Notice of Rescission of Declaration of Default, VCRI 20140724-00092097, a document Plaintiffs attach as Exhibit 9 and incorporate as if it appeared here. In Exhibit 9, Title 365 claims to act for SPLS and claims to rescind VCRI 20110718-00104349 (Exhibit 4).

64.  Concurrent with Exhibit 9 (a few days later), Title 365 recorded a Substitution of Trustee, VCRI 20140724-00092096-0, a document that Plaintiffs attached as Exhibit 8 and incorporate now as if it appeared here, in which Title 365, claiming to act on behalf of the beneficiary, substituted in as trustee Sage Point Lender Services, a known, fly-by-night company that offered like-kind trustee services, until California homeowners, including Plaintiffs, sued SPLS out of existence.

64. Concurrent with Exhibit 8, Title 365 recorded a 4-page 07/24/2014 Notice of Default (NOD2), VCRI 20140724-00092098, a document that Plaintiffs attached as Exhibit 10 and incorporate now as if it appeared here. Plaintiffs, knowing that Defendants had no authority to undertake these actions, again sued. It was to this NOD that Defendant Title 365 attached a declaration from Jennifer Talbot, seeking by this to satisfy statutory noticing requirements (note that this Talbot declaration is dated 06/14/2014).

65. Nothing further arose with the Property until 08/29/2016. On that date, the Defendant Barrett, claiming to act for some unknown, unnamed beneficiary, rescinded SPLS's 07/24/2014 NOD using Exhibit 11 or  VCRI 20160829-00123282. No one from Barrett actually signed that rescission, though; rather, a Nationstar employee signed it (Jason Vasquez).

---

morals." Any act that is *not lawful* has no legal affect and is therefore *void*.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC: PLAINTIFFS' FIRST AMENDED COMPLAINT]

66.  VCRI 20160829-00123282 (Exhibit 11) is bogus on its face. No one connected to it was willing to swear against perjury, nor even present it to a notary (not even notaries that the Defendant Nationstar typically uses, such as Demetrice Person, who owns a nail salon in the Dallas-Forth Worth area, or Demetrice's friend, Tina Marie Braune. These two, Demetrice and Tina, notarize, witness, and swear documents as a team, and have done so to back forecloses across the nation. Plaintiffs will seek testimony from Demetrice and Tina. In the interim, Plaintiffs on information and belief allege VCRI 20160829-00123282 to be a last-ditch effort by Nationstar, Title 365, Solutionstar, NBS, and Xome to maneuver themselves onto a new foreclosure against Plaintiffs' Property. These brought in Defendant Barrett because they could no longer raise SPLS (whose blood was sucked dry by litigation); Barrett, at all times unknown and unconnected to the entire affair, was an actor "sufficiently remote" to preclude any heat or "blow-back" from damaging Fortress, Nationstar, LXS-2005-5N, NBS, Solutionstar, or Xome. Barrett had zero authority to record said rescission, had no knowledge of the facts, gave no affidavit or declaration detailing its role, and even refused to have anyone from its offices sign it (let alone swear to it, verify it, notarize etc.)

67.  On information and belief, Plaintiffs allege that Defendants NBS  and Title 365 next recorded VCRI 20161208-00181851-0, a true copy of which Plaintiffs attached as Exhibit 13, the current 12/08/2016 Notice of Default and Election to Sell Under Deed of Trust (NOD).

67.  On information and belief, Plaintiffs allege that Defendants NBS and Xome are thus poised to conduct an illegal foreclosure. And, in that very same instant that they do (illegally sell Plaintiffs' home) these Plaintiffs will sue them again under that cause. That is, NBS and Xome, directed by remaining Defendants, have already undertaken requisite overt acts, and are poised to undertake illegal acts. Whether remaining Defendants, such as Nationstar, will "throw NBS and Xome under the bus" remains to be seen. But on information and belief, Plaintiffs allege that NBS and Xome principals are aware that they have no legal authority to sell the Property, just as Nationstar, LXS-2005-5N, Solutionstar, and Barrett know this. None of these Defendants, all who claim to act for LXS-2005-5N, have any beneficial interest in the property, just as LXS 2005-5N has no such interest.

68. Xome is scheduled to sell Plaintiffs' home on July 6, 2017. On July 28, 2017, the Plaintiffs will therefore apply, ex parte, to enjoin Xome from doing so. That application will be based on this complaint, declarations, an MOA, Table of Authorities, and related materials.

**7. First Cause of Action**
**Slander of Title**
**Against All Defendants**

69. Plaintiffs reallege Paragraphs 1-68.

70. California recognizes the tort of slander of title, its elements being [1] want of privilege; [2] publication; [3] falsity; and [4] direct pecuniary loss.

71. To state a title slander claim, a litigant must demonstrate title or an interest in the subject property. Appel v. Burman (1984) 159 Cal.App.3d 1209, 1214; W. Prosser & P. Keeton, The Law of Torts §§ 128—130 (5th Ed. 1984); Restatement (Second) of Torts § 624 (1977). 33 Edwards v. Burris (1882) 60 Cal.157; Truck Ins. Exchange v. Bennett (1997) 53 Cal.App.4th 75, 85, Fn. 3; Davis v Wood (1943) 61 Cal.App.2d 793-794.

72. Title slander defendants argue that Code Civ. Proc' §y42 shrouds recordation in privilege, but this is untrue; California does not pardon acts it classifies as criminal. Against they who record such false documents, CA Penal Code §§ 115.5(a), 470(c), and 532f codify such activities as fraud, and no California statute permits citizens to commit fraud, nor does any CA statute affords such privilege.

73. Defendants Barrett, LXS 2005-5N, NBS, Nationstar, Solutionstar, TITLE365, and Xome, for the common purpose of initiating foreclosure proceedings, directly issued or indirectly caused to be created, and later recorded, the following documents:

73.[a] Ventura County Recorder Doc 20110718-00104349-0

73.[b] Ventura County Recorder Doc 20140724-00092096-0

73.[c] Ventura County Recorder Doc 20140724-00092097-0

73.[d] Ventura County Recorder Doc 20140724-00092098-0

73.[e] Ventura County Recorder Doc 20140724-00092098-0;

73.[f] Ventura County Recorder Doc 20160829-00123282-0

73.[g] Ventura County Recorder Doc 20161207-00181465-0

73.[h] Ventura County Recorder Doc 20161208-00181851-0.

73.I] Ventura County Recorder Doc 20170313-00034666-0

74. Defendants Barrett, NBS, Nationstar, Solutionstar, LXS-2005-5N, TITLE365 and Xome, by creating, publishing, or causing to be published said documents, all which contain false statements, and all that falsely characterize Defendants as having some authority, interest, ownership, right or title in Plaintiffs' Deed, Loan, Mortgage, Note or Property, at County Recorder offices and in various courts, did disparage our Property title.

75. Defendants Barrett, NBS, Nationstar, Solutionstar, LXS-2005-5N, TITLE365 and Xome, knew or should have known that their actions were improper because they had title records demonstrating assignment chain breaks, and further, each and all are industry experts who cannot now claim ignorance. That is, Defendants are seasoned professionals and industry leaders in the field of mortgage lending, pooling, and servicing. Thus, these Defendants are not average citizens but instead expert practitioners in their chosen field. Any of these Defendants, we feel certain, could correctly, quickly identify mortgage document or title chain irregularities.

76. If Defendants did know that their actions were improper, they then proceeded with reckless disregard if said documents were disparaging, and notwithstanding said knowledge, careened forward with zero regard for damage that said documents might inflict.

77. Defendants had a duty to Plaintiffs and courts to abstain from filing void documents, documents that spread false statements publicly and thereby disparage property titles. Defendants breached that duty by recording the aforesaid documents.

78. Acts of Defendants were the direct, proximate cause of Plaintiffs' cost of suit, vendibility impairment, and other costs. It is unnecessary for Plaintiffs to prove that they lost an actual sale by Defendants' wrongful actions.

79. Title slander plaintiffs need not demonstrate loss of a particular sale. Miller & Starr California Real Estate (3d ed. 2009) § 11:48; and Hill v. Allan (1968) 259 Cal.App.2d 470, 489. Forseeability that any buyer or lessee would refrain is sufficient. Seeley, supra, 190 Cal.App.3d .

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

80. Nor must title slander plaintiffs suffer large losses: even costs to correct a problem are sufficient to demonstrate damages. Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC (2012) 205 Cal.App.4th 999, 1031. We will seek remedy according to proof at trial, along with $114,000.00 in litigation costs thus far.

### 8. Second Cause of Action
### Violation of California Civil Code 2924(a)(6)
### Against Defendants Nationstar, Title 365, NBS, and Xome

81. Plaintiffs reallege Paragraphs 1-80.

82. California Civil Code 2924(a)(6) provides that "No entity shall record or cause a notice of default to be recorded or otherwise initiate the foreclosure process unless it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder.."

83. Plaintiffs on information and belief allege that Nationstar, Title 365 and NBS, who imperiously recorded or caused to be recorded VCRI 20161208-00181851-0, aka Exhibit 13, the current 12/08/2016 Notice of Default and Election to Sell Under Deed of Trust (NOD), were not, on 12/08/2016, beneficial interest holders, original trustees, lawful and legitimately substituted trustees, or agents for beneficial interest holders, at least not relative to the Plaintiffs' Deed, Mortgage, Note or Property.

84. Plaintiffs on information and belief allege that AWL, Countrywide and ReconTrust were the original lenders, mortgage holders and trustee of Plaintiffs' Deed, Mortgage, Note or Property. Plaintiffs further allege that Title 365 and NBS have never served as agents for AWL, Countrywide or ReconTrust relative to Plaintiffs' Deed, Mortgage, Note or Property, nor could Nationstar, Title 365 or NBS secure such agency, directly or by succession, as will more fully appear.

85. Civil Code § 2295 defines an *agent* as one who represents another, the party called *principal,* in dealings with third parties. The burden of proving agency's existence falls to they who assert it (*Burbank v. National Casualty Co.* (1941) 43 Cal.App.2d 773, 781 [111 P.2d 740]). Agency invariably rests on agreement between principal and agent, but the agreement need not be written; business behavior can often be instructive or even probative in determining certain duties or obligations. *D'Acquisto v. Evola* (1949) 90 Cal.App.2d 210, 213 [202 P.2d 596].

86. On information and belief Plaintiffs allege that agency between prospective principals AWL, Countrywide, and ReconTrust and prospective agents Nationstar, Title 365 and NBS, at least relative to Plaintiffs' Mortgage, was not a legally-possible contingency.

87. On information and belief, Plaintiffs allege that Nationstar, Title 365 and NBS were never agents of AWL, Countrywide or ReconTrust re Plaintiffs' Mortgage, for a simple reason: NBS arose as a CA business entity on 04/01/2011 (CA SOS 201109510095) and Title 365 re-emerged as a like entity on 08/01/2012 (under CCN 1942389). AWL, Countrywide and ReconTrust ceased their independent operations before Nationstar, NBS and Title 365 began to offer such services. To secure said agency, Nationstar, NBS and Title 365 would need a functioning time machine.

88. Plaintiffs on information and belief further allege that even if Nationstar, NBS and Title 365 used such a time machine to return to (say) 2011 to secure said agency, they would still run afoul of section 2924(a)(6). This is because neither AWL nor Countrywide nor ReconTrust retained any beneficial interests, ownership, rights or title in the Plaintiffs' Mortgage, Deed, Note or Subject Property that extended beyond 9:15 am on 10/12/2005.[26] Time-travelers Nationstar, NBS and Title 365 might thus be legitimate, illustrious AWL, Countrywide or ReconTrust agents, but they would nonetheless still lack statutory authority to record 20161208-00181851-0 for principals AWL, Countrywide or ReconTrust, at least relative to *Plaintiffs*' Mortgage.

---

26  Plaintiffs only recently discovered this.

89. Plaintiffs on information and belief allege that Nationstar, Title 365 and NBS, by recording VCRI 20161208-00181851-0 on 12/08/2016 without 2924(a)(6)'s qualifications violated and continue to violate that statute. Bereft of said agency and statutory qualifications, Nationstar, Title 365 and NBS are and will remain for 2924(a)(6)'s purposes unauthorized to lodge NODs or initiate foreclosure proceedings for AWL, Countrywide or ReconTrust, at least re *Plaintiffs*' Mortgage and Property.

90. As a proximate result of Nationstar's, Title 365's and NBS's Civil Code 2924(a)(6)' violations, the Plaintiffs have suffered, do suffer, and will continue to suffer substantial, irreparable injury, not merely from imminent loss of the Subject Property, but also for Defendants' blind and continued denial to Plaintiffs of rights that California statutes extend to every other homeowner.

91. Plaintiffs thus seek 20161208-00181851-0's cancellation and rescission, the two sole remedies that courts can (apparently) grant Plaintiffs under this cause, for the following.

92. Although California's lawmakers enshrined Civil Code 2924(a)(6) into law and they infused it with unambiguous language ("No entity *shall*"), they did not provide in it explicit penalties for "violators," nor explicit remedies for "victims."

93. Civil Code section 2924(a)(6) in this way distinguishes itself from §§ 2924.12(a)(1) and 2924.19(a)(1), which advance explicit remedies and explicit penalties. Section 2924.12(a)(1), for example, authorizes injunctive relief for material violations of 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, and 2924.17; section 2924.19(a)(1) authorizes injunctive relief for material violations of 2923.5 or 2924.18. Both 2924.12(a)(1) and 2924.19(a)(1), finally, punish intentional, reckless or willful misconduct by imposing on actors a) actual and statutory damages of $50,000.00; or b) treble damages, whichever proves greater.

94. Plaintiffs assume that legislators consciously omitted from section 2924(a)(6) (and thereby consciously denied borrowers) any black-letter, off-the-shelf relief. Nor is it difficult to divine *why* legislators did this: section 2924(a)(6) was less an explicit statement from lawmakers to shield homeowners than it was a general warning to lenders, servicers and trustees. To draft 2924(a)(6) differently (say, to authorize injunctions or other, early-in-dispute interlocutory options) would have been to create an alternate foreclosure defense trajectory that could increase delays and even undermine California's long-established statutory scheme.

### 9. Third Cause of Action
### Violation of California Civil Code 2924.12(a)(1) and 2924.17
### Against Defendants Nationstar, NBS, Title 365, Barrett, Xome

95. Plaintiffs reallege Paragraphs 1-94.

96. Civil Code § 2924.12(a)(1) provides: "If a trustee's deed upon sale has not been recorded, a borrower may bring an action for injunctive relief to enjoin a material violation of Section 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17."

97. Plaintiffs invoke Civil Code § 2924.12(a)(1) and 2924.17 against material violations of §§ 2923.5, 2923.55 and 2924.17 that Defendants Nationstar, NBS, and Title 365 undertook on and after 12/08/2016.

98. Civil Code § 2924.17(a) provides:

> "A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence. "

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

99. By Civil Code 2924.17, California legislators addressed one of the Mortgage Crisis's more troubling revelations: before the National Mortgage Settlement and California's HBOR imposed on lenders and servicers stringent foreclosure procedural guidelines, lender/servicer conduct reflected inordinately high incidences of negligent or even intentional, reckless and willful documentary falsification.

100. OCC's Consent Order against BAC (AA-EC-11-12), for example, provided exhaustive and damning factual findings about BAC's foreclosure activities. Noting that BAC's foreclosure inventory exploded between January 2009 through September 2010,[27] OCC went on to describe illegal foreclosures predicated on false, misleading or outright fraudulent affidavits/declarations that BAC filed (or caused to be filed) in state and federal courts and recorders offices.[28]

101. In 1:12-cv-00361-RMC (US v. Bank of America), where 49 US states and District of Columbia sued BAC, more thorough examination(s) uncovered rampant deceptive business practices that BAC and associated firms used to affect outright illegal foreclosures:

> "[p]reparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); or preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as robosigning. Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks."

---

27  A byproduct of BAC subsuming Countrywide and subsidiaries, including ReconTrust (see Para. XX).
28  OCC AA-EC-11-12; Article I, Comptroller's Findings at p. 2.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

102. Our judiciary, which has suffered nearly a decade of lawsuits over these matters, long ago tired of the Crisis, but new discoveries of such activity arise every few months. On April 20, 2017, for example, CFPB refiled against Ocwen Financial Corporation,[29] after uncovering more of the same ["Ocwen has compounded these failures by illegally foreclosing upon borrowers' loans and selling loan servicing rights to servicers without fully disclosing or correcting errors in borrowers' loan files...As a result, the Bureau alleges that Ocwen has wrongfully initiated foreclosure proceedings on at least 1,000 people, and has wrongfully held foreclosure sales."][30]

103. Given the foregoing, Civil Code 2924.17 takes on a more serious character than, say, section 2924(a)(6) – a result that initially seems counterintuitive. Section 2924(a)(6) entails the foreclosing party lacking statutory authority to record notices of default or initiate foreclosure proceedings, whereas 2924.17 concerns affidavits and declarations that accompany NODs.

104. Plaintiffs on information and belief allege that Nationstar, Title 365 and NBS, who imperiously recorded or caused to be recorded VCRI 20161208-00181851-0, aka Exhibit 13, the current 12/08/2016 Notice of Default and Election to Sell Under Deed of Trust (NOD), violated not merely Civil Code section 2924(a)(6), they also violated 2923.5, 2923.55, and 2924.17, as we now show.

105. Cal. Civil Code § 2923.55.(a) mandates that any Notice of Default recorded pursuant to Civil Code § 2924 shall include a declaration that the mortgage servicer contacted the borrower, tried with due diligence to contact the borrower, or that no contact was required because that individual did not meet the definition of 'borrower' pursuant to Section 2920.5(c) of Civil Code section 2923.55.

---

29  This, after not long ago resolving allegations that followed a 2013 investigation.
30  *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC.* Case No. 9:17-CV-80495; US District Court, S.D. Florida.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

106. The NOD-attached Due Diligence Declaration (DDD) demonstrates just how little effort Defendants devoted to compliance: DDD is fatally flawed. Jennifer Talbot made the declaration and certified it, true. But said DDD, that Title 365 and NBS attached to the current NOD, is a Civil Code § 2923.55(f) DDD that Ms. Talbot issued *three years ago*.

107. On information and belief, Plaintiffs allege that Ms. Talbot attached this exact same declaration to the 2014 NOD (6/23/14, for Nationstar Mortgage). The current NOD therefore issued with a three-year-stale Due Diligence Declaration that is at best void. Plaintiffs further allege on information and belief that, as VCRI 20160829-00123282-0 (or Exhibit 13) clearly demonstrates, VCRI 20140724-00092098-0 (Exhibit 10, Notice of Default and Election to Sell Under Deed of Trust, 2014) also bore this same Talbot Due Diligence Declaration.

108. On information and belief, Plaintiffs allege that VCRI 20160829-00123282-0, as a rescission, rescinded VCRI 20140724-00092098-0 and all its inextricable components, including Ms. Talbot's Due Diligence Declaration, a Declaration that in 2014 might have been fine, but a Declaration that in 2017 is not merely generally void but that also violates the black-letter sense of sections 2923.5, 2923.55, and 2924.17. For, in what manner can Talbot's 2014 Declaration possibly satisfy the requirements of 2923.5, 2923.55, and 2924.17?

109. Plaintiffs on information and belief allege that the statute demands that NOD-attached affidavits and/or declarations must be:

109.[a] accurate;

109.[b] complete;

109.[c] supported by competent evidence; and

109.[d] supported by reliable evidence.

110. Civil Code sections 2923.5, 2923.55, and 2924.17 all impose these requirements, and Section 2924.17(b) additionally provides that "Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower s default and the right to foreclose, including the borrower s loan status and loan information."

111. The statute's wording here is not quite absolute, but is clear enough that any reader can readily perceive its meaning. Its objects are all variables dependent on instant truth, truth which transforms under the dimension of *time*. The borrower's condition, the lender's (or the servicer's or trustee's) authority to foreclose; the borrower's loan status; and the borrower's comprehensive loan information – all these variables are time-dependent. A Due Diligence Declaration three-years-stale cannot impute to an NOD "accurate" or "complete" data; the borrower's economic health, physical well-being, and many other conditions can drastically change over three years (the borrower could even be deceased).[31]

112. Plaintiffs on information and belief allege that coupled with the Title 365 and NBS imperious NOD, Talbot's three-year-stale Due Diligence Declaration constitutes a "material violation" of the statute. The Declaration is not merely a document; it constitutes verification that a presumably authorized foreclosing party has, before initiating foreclosure, satisfied its central statutory obligations. To ensure compliance, the statute mandates that the mortgage servicer review all germane background material. Where a servicer (or any party seeking to foreclose) attaches an on-its-face legally-deficient Declaration to an NOD (an NOD that itself remains suspect), there is evidence to foster strong presumption that said servicer did *not* read and review all germane background material.

113. Defendants, and each of them (especially, Nationstar, NBS, and Title 365), if they were indeed lawful and legitimate entities that they claim to be, had an independent duty to ensure that all documents referenced herein and filed or recorded by them or their agents were "accurate and complete and supported by competent and reliable evidence."

114. Plaintiffs on information and belief allege that Defendants, their principals, agents, and/or employees, and each of them willfully or negligently violated Civil Code section 2924.17 by filing publicly recorded instruments related to a foreclosure proceeding without being "accurate and complete and supported by competent and reliable evidence," namely, the NOD and Talbot's Due Diligence Declaration.

---

31  How long is the variable "three years?" You be the judge: three years ago, Prince Rogers Nelson was alive, England had no Brexit plans, and most Americans expected Hilary Clinton to be our first female president.

[THUTAMA v. FORTRESS INVESTMENT GROUP LLC, PLAINTIFFS] FIRST AMENDED COMPLAINT]

115. Plaintiffs on information and belief allege that Defendants, their principals, agents, and/or employees, and each of them breached said duties by documents they recorded which remain subject to section 2924.17.

116. Plaintiffs therefore bring this action pursuant to Cal. Civ. Code section 2924.12(a)-(b) to enjoin Defendants' material violations under section 2924.17.

117. Plaintiffs are informed and believe, and thereon allege the documents filed by Defendants were not supported by competent and reliable evidence, and instead filed by individuals with no personal knowledge of Plaintiff's property, loan status, and/or alleged default.

118. Plaintiffs are informed and believe, and thereon allege Defendants filed documents electronically, commonly called "Robo-signing," with no review of whether the evidence is competent and/or reliable. Plaintiffs allege Defendants' standard business practice is to record public documents without competent and reliable evidence in violation of Cal Civ. Code § 2924.17(b).

119. Section 2924.17(b) places the burden directly on mortgage servicers as follows:

> "(b) Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

120. Plaintiffs are informed and believe, and thereon allege that Defendants did not review their own right to foreclose and acted without regard to the truth they had no authority from the beneficiary to foreclose. They instead used documents like VCRI 20160829-00123282, which is bogus on its face.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

121. No one connected to it was willing to swear against perjury, nor even present it to a notary. Plaintiffs on information and belief allege VCRI 20160829-00123282 to be a last-ditch effort by Nationstar, Title 365, Solutionstar, NBS, and Xome to maneuver themselves onto a new foreclosure against Plaintiffs' Property. These brought in Defendant Barrett because they could no longer raise SPLS (whose blood was sucked dry by litigation); Barrett, at all times unknown and unconnected to the entire affair, was an actor "sufficiently remote" to preclude any heat or "blow-back" from damaging Fortress, Nationstar, LXS-2005-5N, NBS, Solutionstar, or Xome. Barrett had zero authority to record said rescission, had no knowledge of the facts, gave no affidavit or declaration detailing its role, and even refused to have anyone from its offices sign it (let alone swear to it, verify it, notarize etc.).

122. Assignees and their agents of the original debt obligation and the security instrument are necessarily required to provide a competent evidentiary foundation that the note and deed were lawfully sold, transferred and accepted by the assignee .

123. As alleged previously, Plaintiffs allege that Defendants hold no beneficial interest in the property and have no valid authority or right to foreclose on Plaintiff's property.

124. Plaintiffs on information and belief allege Defendants did not act on behalf of the beneficiary and do not have evidence to support such claim.

125. Plaintiffs on information and belief allege that they have repeatedly notified Defendants they lack the authority to foreclose and lack the authority to file publicly recorded documents against the Property interest; the current recorded documents need to be rescinded.

126. However, Defendants continue to file publicly recorded documents in violation of section 2924(a)(6), which states as follows:'

"No entity shall record or cause a notice of default to be recorded or otherwise initiate the foreclosure process unless it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest. No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest." [emphasis added].

127. Plaintiffs on information and belief again allege that Defendants do not have the authority to commence the foreclosure process as they have not yet been able to prove they have the authority from the beneficial interest to foreclose.

128. Plaintiffs on information and belief that Defendants are legally obligated to ensure that all facts in all material instruments in the chain of title are true, correct and are verifiable by competent and reliable evidence to support those facts. Plaintiffs are informed and believe, and thereon allege that Defendants have willfully or at the least negligently breached their duty.

129. Plaintiffs on information and belief that all assignments and all recorded instruments must contain truthful statements and facts that are authenticated or verified by evidence and by a person with personal first-hand knowledge, or the instrument is void.

130. Plaintiffs on information and belief allege that substantial competent and reliable evidence must be offered to a challenge by borrowers to support the recitals contained within all instruments that affect their title. The Plaintiffs have invoked such a right under statute and deed of trust contract wherein it states that the borrower has a duty to defend title against all others.

131. Civil Code section 2924.12(a)(1) provides that if a trustee's deed upon sale has not been recorded, a borrower may bring an action for injunctive relief to enjoin a material violation of Section 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17.

132. Plaintiffs on information and belief allege that coupled with 20161208-00181851-0, aka Exhibit13, the current 12/08/2016 Notice of Default, Talbot's three-year-stale Due Diligence Declaration constitutes a "material violation" of the statute's provisions.

133. Plaintiffs therefore seek injunctive relief under that title, as will more fully appear in their upcoming ex parte application.

### 10. Fourth Cause of Action
### Cancellation of Instruments
### Against All Defendants

134. Plaintiffs reallege Paragraphs 1-133.

135. Plaintiffs on information and belief allege that Defendants, individually or together, created and recorded documents at Ventura County Recorder, there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled, which we as Plaintiffs now do. We ask that the court cancel the following instruments: .

136. That 04/30/2014 Substitution of Trustee requested by TITLE365 from NATIONSTAR MORTGAGE LLC to SAGE POINT LENDER SERVICES, LLC., bearing Ventura County Recorder Document ID 20140724-00092096-0, purportedly issued from "Nationstar Mortgage LLC as 'attorney in fact' for US BANK NATIONAL ASSOCIATION AS TRUSTEE FOR THE LXS 2005-05N TRUST FUND."

136. That 07/24/2014 Notice of Rescission of Declaration of Default and Demand for Sale requested by Title365 and that falsely advanced SAGE POINT LENDER SERVICES, LLC as trustee and that bears Ventura County Recorder Document ID 20140724-00092097-0.

137. That 07/24/2014 Notice of Default and Election to Sell Under Deed of Trust requested by Title365 that purported SAGE POINT LENDER SERVICES, LLC as duly appointed trustee operating on behalf of American Wholesale Lender, that bears Ventura Recorder Document ID 20140724-00092098-0.

138. That 09/29/2016 Notice of Rescission of Declaration of Default and Demand for Sale by TITLE365 that advanced BARRETT, DAFFIN, FRAPPIER, TREDER & WEISS LLP as "agent" for an unknown beneficiary, and that bears Ventura County Recorder ID 20160829-00123282-0.

139. That 12/07/2016 Substitution of Trustee, requested by TITLE365, falsely casting NBS as substituted trustee. Said Substitution bears Ventura County Recorder Document ID 20161207-00181465-0.

140. That 12/08/2016 Notice of Default and Election to Sell Under Deed of Trust requested by TITLE365 and claiming NBS DEFAULT SERVICES, LLC as substituted trustee for NATIONSTAR MORTGAGE LLC, that bears Ventura County Recorder Document ID 20161208-00181851-0.

141. That 03/13/2017 Notice of Trustee's Sale, recorded by Title 365 and NBS, who falsely claim authority to sell, and that bears Ventura County Recorder Document ID 20170313-00034666-0.

## 11. Fifth Cause of Action
### Quiet Title
### Against All Defendants

142. Plaintiffs reallege Paragraphs x-x.

143. The real property that is the subject of this case is located at 111 Jackpot Lane, Folsom, County of Sacramento, California, APN: 211-0000-0000, as more fully described in Grant Deed attached.

144. The defendants herein named as "all persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the property described in the complaint adverse to plaintiff's title, or any cloud on plaintiff's title thereto" (hereinafter sometimes referred to as "the unknown defendants") are unknown to plaintiff. These unknown defendants, and each of them, claim some right, title, estate, lien, or interest in the hereinafter-described property adverse to plaintiff's title; and their claims, and each of them, constitute a cloud on plaintiff's title to that property.

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]

145. Plaintiffs are informed and believes, and thereon alleges, that at all times herein mentioned, defendants were acting on their own behalf and as agents or employees of each of the other Defendants, and the acts described hereinafter were done in the course and scope of such agency or employment, as well as on their own behalf. Further, Defendants were authorized by Defendant principals in the doing and the manner of the acts alleged, and ratified said behavior. Hereafter, unless otherwise specified, defendants including Doe 1 through Doe 10 will be referred to collectively as "Defendants."

146, This is not an action on a retail installment contract or on a retail installment account, subject to the provisions of section 1812.10 of the California Civil Code, nor on a motor vehicle contract or purchase order subject to the provisions of section 2984.4 of the California Civil Code. The allegations herein stated on information and belief have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

147. The basis of plaintiffs' title is the sequence of events described above. Plaintiffs are the only parties present that have any title, interest, ownership, or equity in the Property.

148. Plaintiffs were possessed of the above-described property within five years of the commencement of this action.

149. Plaintiffs information and belief allege that Defendants claim an interest adverse to plaintiffs in the above-described properties as the holder of record title. Some of the unknown defendants claim interests in the property adverse to plaintiffs' as assignees and successors of unknown entities.

150. Plaintiffs are seeking to quiet title against the claims of defendants as follows: the claims of defendants are without any right whatever and such defendants have no right, title, estate, lien, or interest whatever in the above-described property or any part thereof.

151. Plaintiffs seek to quiet title as of the date this complaint is filed with the court.

<u>12. Relief</u>

WHEREFORE, Plaintiffs Felicia and Liloi Tuitama respectfully ask for the below relief.

1. That judgment be entered in Plaintiffs' favor and against Defendants;

2. For a preliminary injunction enjoining the sale (Civ. Code ;

3. For cancellation of instruments;

4. For compensatory and statutory damages;

5. For such other and further relief as this court deems proper.

We swear the above against penalty of perjury by laws of the State of Georgia and United States, and I execute the same by my below signature. Sworn on 06/27/17 in Bowdon County, Georgia.

Dated: 06/27/17                                    Respectfully Submitted,


_Felicia Tuitama_                                 _Liloi Tuitama_
Felicia Tuitama, Party in Pro Se                 Liloi Tuitama, Party in Pro Se

[TUITAMA v. FORTRESS INVESTMENT GROUP LLC; PLAINTIFFS' FIRST AMENDED COMPLAINT]